# CHARLESTON.

L. C. BUCHANAN v. NORFOLK & WESTERN RY. CO. *et al.*

(No. 5036)

Submitted September 30, 1924.     Decided June 9, 1925.

1. RAILROADS—*Traveler on Crossing Double Tracks Must Look in Both Directions.*

    Point 2 of the syllabus in the case of *Cline* v. *McAdoo*, 85 W. Va., 524, followed and applied.

    (Railroads, 33 Cyc. pp. 1009, 1120).

2. NEGLIGENCE—*Last Clear Chance Doctrine Held Inapplicable.*

    The "last clear chance" doctrine cannot be successfully invoked where the plaintiff has carelessly placed himself in a position of danger, and the record discloses no act of omission or commission by the defendants, after discovering the danger to plaintiff, whereby the accident might have been avoided.

    (Railroads, 33 Cyc. p. 1049).

    (Note: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi).

Error to Circuit Court, McDowell County.

Action by L. C. Buchanan against the Norfolk & Western Railway Company and others. Judgment for defendants, and plaintiff brings error.

*Affirmed.*

*Howard & Howard,* for plaintiff in error.

*F. M. Rivinus,* and *Strother, Sale, Curd & Tucker,* for defendants in error.

HATCHER, JUDGE:

The plaintiff was driving a Ford coupe, which was struck by an electric motor of defendant company at a road crossing at Ennis, in McDowell County. For injuries received in the collision, he brought this action in the circuit court of said county, joining with the company as defendants Bralley and McIntosh, who were the engineer and helper respectively, on the motor which struck the coupe. At the conclusion of the evidence, the court instructed the jury to find for de-

fendants, and thereupon rendered judgment in their favor. The plaintiff alleges error.

At the road crossing at Ennis are three railroad tracks. The track on the south side is used for trains going east, and is called the "eastbound" track. The track on the north is used for trains going west, and is termed the "westbound" track. The middle track is a storage track. The width of the three tracks is 33 feet. An electric bell had been installed at the crossing, which automatically signalled the approach of trains. The plaintiff was traveling eastwardly on the day of the injury. He had crossed the eastbound and storage tracks, and was on the westbound track when the collision occurred. The motor weighed 270 tons, and was at the time running "light", at the rate of 28 miles per hour. The coupe was in low gear and making about 4 or 5 miles an hour as it approached the track. For a distance of about 50 feet along the road and crossing before the coupe arrived at the place of collision, the westbound track was clearly visible eastwardly for fully 1,000 feet.

The record contains the usual conflict in evidence between the witnesses for plaintiff and the witnesses for defendants as to the sounding of the motor whistle for the crossing, and the ringing of the automatic crossing bell. A man named Stapleton, who accompanied the plaintiff, was killed. A bottle of whiskey was found in the coupe after the accident. The plaintiff stated that he had not drunk any whiskey that day, and that the bottle belonged to Stapleton. Plaintiff admitted he did not see the motor until just as it struck his automobile. There is a "turn" in the county road 120 feet from the place of collision. Plaintiff did not look "up the track" (i. e. eastwardly), after passing this turn. As his evidence thereon is vital to the determination of this case, it is here given in full:

> "Q. Before you got to that turn, did you look to see whether or not there was any train on that track?
> A. I remember looking up before I got there to the turn.

Q.  You looked up the railroad before you got to the turn?

A.  Yes, sir.

Q.  You saw nothing?

A.  No, sir.

Q.  After you made the turn in the road, you crossed a little bridge there, did you?

A.  Yes, sir.

Q.  Then you went on along the road and across the railroad track?

A.  Yes, sir.

Q.  When you made the turn there, did you look up the railroad to see whether or not any train was coming?

A.  I don't guess I did.

Q.  When you got up within two or three or four feet of the track, did you look up the railroad track to see whether or not a train was coming?

A.  No, sir.

Q.  From the time you started across that track to the time, the second or two before you were struck, while you were crossing that track, had you looked up that track at any time to see whether or not a train was coming?  From the time you started across the eastbound track and over to the westbound track, while you were crossing, did you look up the track to see whether or not a train was coming?

A.  No, sir.

THE COURT:  You did not.

MR. HARMAN:  Q.  Why didn't you look up the track in an easterly direction?

A.  I suppose I was depending on Mr. Stapleton, to some extent, and listening for the bell.

Q.  Why do you say you were depending on Mr. Stapleton to look up in that direction?

A.  I told Mr. Stapleton to look up there before we got to the crossing, and I would look down.

Q.  Before you got to the crossing?

A.  Yes, sir.''

In approaching a railroad crossing the law imposes upon a traveler the duty of looking, as well as listening, for an approaching train.  In this case, while the plaintiff listened for the automatic bell, he unequivocally admits that he did not look in the direction of the approaching train, for a dis-

tance of 120 feet before he ventured upon the westbound track. His own testimony presents a case so clearly one of negligence on his part that it is unnecessary to discuss the evidence relative to the sounding of the crossing signal by the engineer or the ringing of the automatic bell.

> "It is as much a breach of duty on the part of the traveler to omit to look and listen as it is for a railroad company to omit the signals required by law, because a duty may be as effectively prescribed by the common law as by legislative enactment. * * * The general rule is that it is not sufficient to look in one direction, but the traveler is under a duty to look in both directions."

Elliott on Railroads, 3rd Ed. par. 1661, p. 550.

> "Where the railroad consists of a double track, on which the trains run in opposite directions are operated, this rule of obligation is not discharged by a traveler by looking only in one direction; it is his duty to look in both directions; and where there is nothing to obstruct his view or hearing the question of his negligence is generally one of law for the court and not of fact for the jury."

*Cline* v. *McAdoo* 85 W. Va. 524.

To overcome the effect of plaintiff's contributory negligence, his counsel invoke the doctrine of the "last clear chance." The testimony of several witnesses who saw the accident, is that the speed of the motor did not check perceptibly before it struck the coupe, and that it ran about 500 feet beyond the crossing before it stopped. These witnesses also stated that the engine whistle did not blow before the collision, but the testimony of each one as to the whistle was modified by such expressions as "I don't know,"—"I didn't hear it." Counsels' contention is expressed as follows:

> "It was apparent that the plaintiff was oblivious to the danger, and that the engineer knew of it, and did not use proper precaution—in fact, no precaution—to save the plaintiff. The engineer and fireman took chances—gambled—on the plaintiff seeing the train and saving himself instead of

doing their plain duty in the premises. It would
have been no trouble for the engineer to have
blown the whistle in ample time for the plaintiff
to have been warned of the approach of the train,
or to have slowed down the speed of the train,
instead of waiting until the collision had taken
place, when it was too late. 'To require less than
this is to under-estimate the sacredness of human
life and its value.' *Gunter* v. *Southern Railway
Co.* (Va.) 101 S. E. 885, at p. 891.''

The testimony of the engineer is that he had noticed this
coupe coming along the country road before it reached the
crossing, but had no reason to believe that it would at-
tempt to make the crossing ahead of the motor; that as soon
as he saw the automobile starting across the eastbound track,
he shut off the engine, applied the emergency brakes, opened
certain valves which dropped sand under the wheels, and
commenced blowing the whistle; that when he realized the
coupe was likely to cross the tracks, the motor was about
200 feet from the crossing; that it took him something like
2 seconds to apply the levers and open the sand valves; that
it took about 2 seconds more before the brakes began to grap-
ple and became effective; and that he used every instrumen-
tality at his command to check the speed of the motor, which
finally stopped as he thought, ''pretty close'' to 300 feet be-
yond the crossing.

The engineer is confirmed by his helper as to the efforts
made to stop the motor, and there is no evidence to contra-
dict them. The physical facts bear out his statement. His
rate of speed was about 40 feet per second. If, when he saw
the coupe coming upon the eastbound track, he was about
200 feet from the crossing, and it was 4 seconds after that
time before the brakes began to take hold, he was within 40
feet of the crossing before the speed of the motor commenced
to diminish. The effect of the brakes on the motor, within
that distance, would have necessarily been so slight that by-
standers, under the excitement of seeing a wreck such as this
one, would not likely have noticed it. If the plaintiff was
going about 5 miles per hour, his rate of speed was one-sixth
that of the motor, and while it was going 200 feet, the coupe

traversed about 33 feet—the exact width of the three tracks. Consequently, the coupe would have had time at that rate of speed, after starting over the eastbound track to have arrived at the point of collision in time and manner as testified by the engineer.

The statement that he thought the motor stopped close to 300 feet beyond the crossing was merely the expression of an opinion.   Tanner, a witness for the plaintiff, made the same estimate as to this distance.   The fact that the motor ran 100 feet or so further before stopping than the engineer thought it ran is not sufficient to discredit his statements of fact as to what he actually did to avoid the collision when it became apparent to him that the plaintiff would likely attempt to cross the westbound track.   No witness for plaintiff said the engineer did not shut off the power of the motor, did not apply the emergency brake, and did not sand the rails.   No witness says there was anything else that could have been done to check the speed of the motor.

The fact that several witnesses did not hear or notice the engine whistle blow until after the collision, is not sufficient to overcome the positive testimony of the engineer and his helper that the whistle was blown prior thereto.   It is common knowledge that railroad engineers are carefully selected men; they are men who have shown themselves not only competent and efficient in the performance of their duties, but men who are alert and prompt in cases of emergency.   The piloting of trains constantly calls for the exercise of these qualities.   Engineers are not the class of men who hold lightly the sacredness of human life.   We find no evidence of any act of omission or commission by the engineer whereby the accident might have been avoided.   The evidence fairly preponderates in favor of the crossing signals having been sounded prior to the collision.   But say they were silent—we cannot favor the theory that a mind so dulled to ordinary care for self preservation as was that of the plaintiff at the time, would have recorded and responded to the warning of the whistle or the bell.   We therefore perceive no foundation in

the record upon which can be based the doctrine of the "last clear chance."

A witness by the name of Whittaker, who was assistant train master for the defendant company, was permitted to testify as to the distance in which the electric motor could have been stopped. The plaintiff says that this was error, on the ground that Mr. Whittaker was not a qualified engineer either of electric motors or steam engines. Mr. Whittaker's evidence was that he had served in the capacity of brakeman and freight conductor, as well as assistant train master; that while he was not a qualified engineer, he had handled every class of engines owned by the defendant company; that he had run passenger and freight steam engines, and had operated electric engines; that his position called for full supervision over all trains, and that he could not perform his duties very well without understanding engines. We think his experience and observation qualified him to give the opinion complained of.

Perceiving no error in the ruling of the trial court, the judgment complained of is affirmed.

*Affirmed.*